PEOPLE ex rel. WIELAND v. KNOX et al., Civil Service Com'rs.

(Supreme Court, Appellate Division, First Department. January 16, 1903.)

1. MANDAMUS—MOTION FOR NEW TRIAL—MAKING CASE—STATUTORY PROVISIONS.
    Code Civ. Proc. § 2082, provides that, after issue joined on an alternative writ of mandamus the proceedings shall be in all respects the same as in an action; and section 2083 provides that an issue of fact joined on an alternative writ of mandamus must be tried by a jury, the same as issues triable by a jury in an action. Section 999 provides that a judge presiding at a trial by jury may entertain a motion for a new trial on his minutes, and section 998 provides that for the purposes of such motion it is not necessary to make a case. Held, that a motion for a new trial on an application for an alternative writ of mandamus was properly made without the making of a case.

2. CIVIL SERVICE EXAMINATION—CHEATING—EVIDENCE—SUFFICIENCY.
    In mandamus proceedings to compel civil service commissioners to place relator on the eligible list for promotion to foreman in the fire department, evidence examined, and held to show that relator, after his papers on the examination for the position had been marked, had substituted other papers, with forged higher markings, for those originally handed in by him.

3. SAME—BURDEN OF PROOF.
    Laws 1899, c. 370, § 13, authorizes the civil service commissioners to refuse to certify as eligible an applicant for a competitive position when such applicant has practiced a fraud in attempting to secure his position on the eligible list. After the examination papers of an applicant for foreman in the fire department had been handed in and marked, it was discovered that higher, forged markings had been substituted, and the board refused to place the applicant on the eligible list. Held that, in mandamus proceedings to compel the board to place the applicant on such list, the burden was on him to show that he was in no wise responsible for such forgeries.

Appeal from special term, New York county.

Mandamus by the people, on the relation of William J. Wieland, against Charles H. Knox and others, as civil service commissioners of the city of New York. From an order directing that a peremptory writ issue, compelling defendants to accept the examination papers of the relator, and to place him on the eligible list for promotion to the position of foreman in the fire department of the city of New York, and also from an intermediate order denying defendants' motion to set aside the verdict of the jury and for a new trial, and also from the judgment of enrollment, defendants appeal. Reversed.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

Charles Blandy, for appellants.
A. J. Skinner, for respondent.

HATCH, J. The relator was a member of the uniformed force of the fire department of the city of New York, holding the rank of assistant foreman. In July, 1898, he filed an application in due form for the position of foreman, and, in accordance with the rules of the civil service commission, submitted himself for examination, and

was examined upon the different subjects, and at the close of such examination he turned in his papers to the examiner then present, who gave them to the chief examiner, who kept them under lock and key until they were submitted to the examiners who were selected to pass thereon. Subsequently the examiners so chosen passed upon the papers of the relator, and, in accordance with the usual practice, each indorsed the rating to which the relator was entitled upon what is called a "marking sheet." The work of each examiner was separate and 'independent of his associates. There were two examiners upon each subject, and there were six subjects upon which the relator was examined. After the examiners had marked the rating upon the marking sheet, each one in turn marked the same rating upon the back of the paper examined, and again the papers were returned to the chief clerk, and by him placed in an iron case and locked. Afterwards he turned the papers over to a clerk, whose duty it was to ascertain the percentage earned, and she locked the papers in her desk. Subsequently, when this clerk came to the papers in this case, her suspicion was aroused that some of them were not correct, because of the fact that the papers were folded so as to make a crease; that the initials of the examiners were not, in her judgment, in the handwriting of the examiners, and her desk had been broken open while the papers were in her care. She called the attention of the chief clerk to the matter, and he caused an examination to be made, as a result of which the civil service commission threw out relator's papers because they believed that some person had broken open the desk of the rating clerk, had extracted the papers of the relator therefrom, had substituted other papers therefor, and had forged the initials of the examiners thereto, and placed new and higher ratings thereon. The result of the substitution of the papers and the forgery raised the respondent's rating from 91.50, which he had earned by his examination, to 95.51, and thus brought him very much nearer the head of the eligible list, jumping him over the heads of 29 other competitors, and brought him from the forty-fourth to the fifteenth on the list. After the rejection of the papers by the civil service commission, the relator asked for a rehearing, which was granted, after which the original action of the commission was affirmed. After the final rejection of the papers by the commission, these proceedings were instituted by an order to show cause why an alternative writ of mandamus should not issue, commanding the civil service commissioners to accept relator's examination papers, and give him the percentage and rating which he claimed. No opposition was made to this motion, and an order was made directing the alternative writ to issue, which writ was duly issued, and a return duly filed thereto. The issues thus raised were brought to trial before a jury, at the close of which certain questions were submitted to the jury, and answers given, as follows:

"First. Were the marks on the paper of the applicant, the relator herein, relating to the subjects, 'Locality,' 'Rules and Regulations,' and 'Laws,' increased after the examiners have made their ratings?" To which the jury answered, "Yes."

"Second. In the case of the papers on 'Localities,' were entirely new papers substituted for those originally handed in by the applicant?" To which the jury answered, "No."

"Third. In the case of the papers on 'Rules and Regulations,' were entirely new papers substituted, instead of the papers originally handed in by the applicant?" To which the jury answered, "No."

"Fourth. Were the forged marks or ratings placed upon the papers containing the answers of the applicant relating to the subjects, 'Locality,' 'Rules and Regulations,' and 'Laws?'" To which the jury answered, "Yes."

"Fifth. Were the initials of the examiners forged upon these papers which are presented in court?" To which the jury answered, "Yes."

"Sixth. Did the applicant, the relator himself, or by another, practice or attempt to practice deception or fraud in his examination, or in securing his eligibility or appointment?" To which the jury answered, "No."

"Seventh. Upon the general issue, do you find for the relator or for the respondents?" To which the jury answered, "For the relator."

After the jury had rendered their verdict, the defendants moved to set aside the answers to each of the several questions which the jury had found in favor of the relator, upon the ground that the answers to such questions were inconsistent with the answers to the questions finding that the ratings of the relator had been increased; that the ratings appearing upon the papers were forged, as were also the initials of the examiners; and that such answers were against the weight of evidence. The defendants also moved to set aside the verdict upon the general issue in favor of the relator, upon the ground that the same was contrary to the evidence, to the weight of evidence, and contrary to law. This motion was denied as to each of the matters to which it referred, and the order denying the same was duly entered by the defendants. A motion was thereupon made at special term by the relator for the issuance of a peremptory writ of mandamus, based upon the verdict of the jury. This motion was opposed upon all of the grounds insisted upon in the return and upon the trial, and also upon the grounds stated in the motion to set aside the verdict and for a new trial. The motion for the issuance of a peremptory writ was granted, and judgment was entered thereon, from which judgment, and from the order denying the motion to set aside the verdict and for a new trial, an appeal was taken by the defendants to this court.

It is claimed by the relator that the facts upon this appeal are not before this court for review, for the reason that the appellants, in order to raise such question, were required to move at special term for a new trial on a case or exceptions, or a case containing exceptions, regularly settled, and directed by the judge to be heard thereon. This contention cannot be upheld. By virtue of the provisions of section 2082 of the Code of Civil Procedure, the proceedings after issue joined upon the facts or law, on an application for an alternative writ of mandamus, are in all respects the same as in an action; and by section 2083 it is to be tried by a jury, as if it were an issue joined in an action specified in section 968, which provides what issues of fact are triable by a jury unless by the consent of the parties it is otherwise disposed of. In People v. Clausen, 74 App. Div. 217, 77 N. Y. Supp. 521, it was held that issues of fact joined upon the granting of an alternative writ of mandamus in their disposition become an action under the Code, not a special proceeding, and, being such, it is con-

trolled by the practice governing the review of such trial. In People
v. Kearny, 44 App. Div. 449, 61 N. Y. Supp. 41, affirmed on appeal in
161 N. Y. 648, 57 N. E. 1121, on opinion below, it was said:

"As an issue of fact joined upon an alternative writ of mandamus must
be tried by a jury, as if it was an issue joined in an action where the party
had the right to trial by jury, its effect, we think, must be the same as the
verdict of a jury in such action, and binding upon the court hearing the ap-
plication for a final order, unless the verdict is set aside or a new trial
granted."

Upon such a trial it is competent for the court, where both sides re-
quest the court to direct a verdict, to act upon such question, and
direct the jury to render a verdict as the court shall determine. Peo-
ple v. Scannell, 172 N. Y. 316, 65 N. E. 165. The authorities cited
to support such conclusion are the cases establishing such rule in the
trial of actions. Adams v. Lumber Co., 159 N. Y. 176, 53 N. E. 805.
Nothing which appears in People v. Clausen, supra, conflicts with this
view. That case holds that the court has no power to nonsuit the re-
lator, as such question is to be disposed of at special term. It does
hold, however, in accordance with the court of appeals, that it has
power to direct a verdict, or submit the issues to the jury for their de-
termination. Supreme court rule 31 does not apply. A case is re-
quired to be made only when the Code does not provide another
method of review. It follows, therefore, that the practice adopted by
the defendants was proper, and the motion for a new trial, as provided
by the provisions of section 999 of the Code, was properly entertained,
and a case was not necessary (Code, §§ 997, 998), and an appeal from
such order brings the matter properly before this court.

When the jury gave affirmative answers to the first, fourth, and fifth
questions, it followed as a necessary conclusion that the other ques-
tions should also have been answered in the affirmative. It was con-
ceded that the examiners placed upon the relator's papers, which were
handed in at the close of the examination, particular ratings; that the
ratings upon the present papers have been forged, together with the
initials of the examiners. It therefore follows that these cannot be
such papers, for the reason that they do not contain the ratings which
the examiners made, or their initials, but both ratings and initials are
forged. The examiners did not place any other marks upon such
papers, and the marks appearing upon these papers are not those
marks. There is but one set of ratings and initials upon the papers
presented. There have been no erasures thereon, nor any other marks
relating to this subject, but those which are forged. Consequently
they are not the papers, and cannot be those, which the examiners
considered and marked. If they were, such marks would appear there-
on, or the fact of the erasures. The ratings upon these papers are
different from those which were placed upon the original papers. It is,
evident, therefore, that when these facts were found the case of the re-
lator was disproved. The substitution of other papers necessarily fol-
lowed, as well as relator's participation therein.

Aside from this question, it seems clear, beyond controversy, that
the verdict rendered by the jury, answering the other question in
the negative, and their general verdict, are against the weight of

evidence. Upon the examination of the relator for promotion, in addition to the papers to which we have already called attention, he was required, as a part of such examination, to write from dictation. The original paper which he then wrote was preserved, and is identified by the relator as his genuine product. It consists of 14 lines written upon a blank furnished by the commissioners, in size a trifle larger than a sheet of legal-cap paper. The matter written shows an omission of some words necessary to preserve a continuity in the subject-matter of the dictation. In addition to this, although there are scant 14 lines of the writing, 18 mistakes, mostly in orthography, are made. It is conceded that the other papers are in the handwriting of the relator. These papers, three in number, consist of 11 pages, precisely the same in size and otherwise as the sheet upon which the dictation was written. Scarcely an error in orthography is found therein, and, while the sheets are for the most part closely written, very few errors of any character are to be found. It is remarkable, to say the least, that at the same time, and under the same circumstances, a person should write 14 lines and commit 18 errors, and write 11 pages and commit no substantial errors. A comparison of the admittedly genuine paper with the others shows in this respect internal evidence of so conclusive a character as to convince the mind that the two sets of papers were not written at the same time and under the same circumstances. The dictation paper carries upon its face the evidence of haste and genuineness. The other papers upon their face carry the evidence of most careful preparation, in which great care must have been taken with respect to orthography and correctness in writing, which would not be likely to obtain unless the writer was possessed of an abundance of time, and the opportunity to consult material necessary to insure accuracy in the use of words, proper spelling, and information. In other words, it is evident that one is the product of pressure, and the other of deliberation and time in preparation, with opportunity to consult authorities upon the subject to which the examination related. In addition to this, it appears that accurate information is given in respect of matter beyond the power of the ordinary memory to retain. Indeed, so accurate is the statement of knowledge upon the given subjects that it would not be out of place in an encyclopædia relating thereto. The first question propounded upon the subject of "Localities" reads as follows:

"A large and dangerous fire occurs in Madison Square. State what companies would probably be called, the location of each company's quarters, and the route which would ordinarily be followed by each."

In answer to this question, relator stated:

"For a large and dangerous fire in Madison Square, it is probable that Box 427 would be pulled and a 5th alarm sent out. The following companies would go."

Then follows a specification of 30 different fire companies, with the respective route which each would take to reach the fire, and in addition thereto that the chief of the department, deputy chief of the Second division, and battalion chiefs from six battalions named would also respond.

In the paper upon "Rules and Regulations," the following question was asked: "On what regular occasions must the national standard be displayed at the peak, and when at half mast?" In answer to this question the relator said:

"At the peak on Jan. 1, Feb. 12 & 22nd, April 27, May 30, June 14, July 4th, Nov. 30, Dec. 25th, and other days as may be designated by the President of the United States, the Governor of the State of New York on inspection days or parade of one or more batallions of the Dept. On formal visits of the Governor of this State, Mayor of this City or a fire Commissioner or inspecting officer and when Officially directed to do so, at half mast on the receipt of official notice of the death of an Officer holding a position in the National, State or City Government or a fire Commissioner, an officer or any member of this Dept. who may lose his life in discharge of duty upon the death of any member of the uniformed force from other causes the Company to which he was assigned will display the flag at half mast until sun set on the day of the funeral."

In the paper upon "Law" it is shown that the relator qualified himself to be a lawyer, if nothing else. The first question called for a description of the bureaus into which the fire department is divided. The question was accurately answered, the three bureaus given, and the duties stated in legal phraseology. The second question was, "What are the legal qualifications for membership of the fire department?" The relator answered:

"No person shall be appointed to membership or continue to hold membership in the fire Dept. that is not a Citizen of the United States or any one who has ever b. n convicted of a felony, or shall any man be appointed who cannot read or write the English language understandingly must also be less than thirty years old and must be over the age of 21 years sec. 734 Chapt. 378, Laws of 1897."

The next question: "From what duties of a citizen is a member of the fire department relieved?" The relator answered:

"No person holding office in the fire Department shall be liable to military or Jury duty, or to arrest on civil process or while actually on duty to service of subpœnas from Civil Courts, as sec. 736 Chap. 378, laws of 1897."

The fourth question reads:

"Under what circumstances may a building be demolished by the fire department, and what, if any, remedy has the owner of such building for the loss of his property?"

The relator did not answer this question in order, but upon the last sheet of the examination paper the answer is given as follows:

"When a building or buildings in this City are on fire it is lawful for the fire Commissioner to direct and order the same or any other building which he may deem hazardous and likely to take fire or convey it to other buildings to be pulled down or destroyed. Upon the application of any man or person interested in any such building so pulled down or destroyed to the Supreme Court in and for this county or any adjoining county in the Judicial Department in which such building is or was situated it shall be its duty to issue a precept for a Jury to inquire into and assess the damages which the owner or the owners have sustained and the proceedings thereon shall be taken as nearly as if the land had been taken for public purposes and when the inquiry and assessment is confirmed by the court the amount so assessed shall be paid by the City of New York to the owner or owners to the full satisfaction of all the persons interested in the building or buildings the court can also compel the attendance of Jurors and witnesses upon any such case as stated in sec. 754, chap. 378 laws of 1897."

The fifth question reads, "Of what common privileges of a citizen is a fireman deprived?" The relator answered:

"If any officer or member of this fire Department is publicly nominated for any Office elective by the people and does not decline the said nomination within ten days after being so notified, it will be taken for granted that he has vacated his Office as per sec. 732, 378 laws 1897."

The sixth question reads, "What is the penalty imposed for a chimney fire or for a bonfire, and what disposition is made of money coming from such penalties?" The relator answered:

"No person shall kindle any fire or furnish the Material for it nor in any way authorize or allow any fire to be made in any street, lane Ave, road or alley or on any pier Wharf or bulkhead, except under such regulations of Permit granted by the fire Commissioner under a penalty of $10.00 fine for each & every offence. If any chimney flue or stove pipe shall take fire the occupant of the premises shall forfeit the sum of $5.00 all fines like this when collected are deposited for the benefit of the fire Department relief fund, as per sec. 760 chapt. 378, laws of 1897. Also sec. 789 Chap. 378, laws of 1897."

The answers to these questions are given in nearly the exact language of the charter provisions upon the subject, contained in the sections to which the reference is made, and in each instance the reference is accurate to the particular section. We think that it is entirely safe to say that there is no lawyer practicing at the bar of this court, nor any member of the court itself, who could have made answers to these questions in the exact language used in the charter provisions, and make reference to the particular sections in which they are found, or state the same in substance. Some of the sections to which reference is made referred to other matters and covered other subjects, but the answer selects with unerring accuracy the particular matter in the charter to which the question directs attention, and with absolute faithfulness sets down the answer in the language used. We are asked to believe that the relator, under the pressure of an examination, did all this,—recalled to his memory the exact language of the section and its number. The questions which we have quoted from the other papers written by the relator at the same time show that the examination covered quite a wide range of subjects, but in each one the memory of the relator rises equal to the occasion, and the accuracy of his information with respect to those matters is little less than marvelous. We think that a military commander, charged with knowledge upon the subject, might find it somewhat difficult, without reference to a manual, to know just when and on what days and at what particular hours the flag was to be floated at the peak and at half mast, and also to the particular and somewhat obscure occasions when its display is called for.

We have quoted sufficiently from the examination papers to show that they bear internal evidence that the person who wrote them must have had before him the authorities from which he wrote the matter at the time he wrote. When comparison is made of these papers in which the relator sets down the information with such accuracy, and with so few mistakes, with the dictation paper, which is concededly his; and considering the number of mistakes therein made, and the inaccuracy of expression in the 14 lines, the mind is driven irresistibly to the conclusion that the two classes of papers were not written at

the same time, nor under the same circumstances. In addition to this, the ink which appears upon the dictation paper is a black-blue color. The ink used in writing the other papers is a plain black color. The evidence upon the part of the defendants tended to show that the black-blue ink was the ink used at this examination, and that a plain black ink was not and had not been furnished for use. This discrepancy is so apparent that the relator was called upon to explain. His statement, in effect, was that, the ink well in the stand which he used had become low and muddy, and, as his neighbor's ink well was being replenished, he asked that his might also be, and that this accounts for the difference in the shade of the inks; the dictation being written by the first, and the other papers by the last. The ink which wrote the dictation paper was not muddy, as it evidently flowed freely, and the same is true of the other ink. Both are different in color, and no foreign mixture of different colored inks is shown in either. This circumstance might not be of controlling importance, perhaps, were there not others in the case.

The proof, therefore, both from the internal evidence of the papers themselves, the difference between the dictation papers and the others, the accuracy of one and the mistakes of the other, the difference in ink, the forgery of the examiners' marks, the creased paper, and the burglarized desk, leads with irresistible force to the conclusion that the original examination papers relating to the three subjects handed in by the relator were abstracted from the desk of the percentage clerk, and the present papers, upon which the relator relies, were substituted therefor. It necessarily follows from this conclusion that the relator was a party to the fraud thus perpetrated. The handwriting upon each paper is his. The three papers, therefore, could not be substituted for the originals without his active agency and participation therein. By virtue of the provisions of section 13, c. 370, Laws 1899, the commissioners were authorized to reject the papers upon its appearing that a fraud had been practiced or deception attempted, and refuse to give the applicant standing upon the eligible list. When it appeared that the marks and ratings of the examiners had been forged, a basis was at once established for the action which was taken by the commissioners, and it thereupon devolved upon the relator to show in explanation of the same that he was not a party thereto, and had no knowledge thereof. In respect of this question the court charged the jury that the presumption of innocence was in favor of the relator, and that the burden of proof was upon the defendants to establish by a preponderance of evidence that the relator himself, or another, had practiced or intended to practice fraud in his examination, in securing his eligibility for appointment. To this charge the defendants excepted. The exception must be sustained. The proof having prima facie established that the commissioners were justified in their action, the burden devolved upon the relator to show that he was in no wise responsible therefor. Blunt v. Barrett, 124 N. Y. 117, 26 N. E. 318. Whitlatch v. Casualty Co., 149 N. Y. 45, 43 N. E. 405.

For these reasons, therefore, the judgment and order appealed from should be reversed, and a new trial granted, with costs to the appellants to abide the event. All concur.